LOTTINGER, Judge.
This is a suit in which the plaintiff, N. D. Stroup, individually and for the use and benefit of his collision, theft and fire insurer, Hardward Mutual Casualty Company of Wisconsin, seeks to recover from the defendant operator of Farrar’s Parking Lot the loss sustained as the result of the alleged theft of a 1956 Ford automobile. The petition recites that the automobile was used almost exclusively by plaintiff’s wife who drove same to and from her work at the Holly Shop in Baton Rouge. It is alleged that on the morning of the alleged theft Mrs. Stroup drove to the defendant’s parking lot where she left her car, received her parking ticket and then proceeded on to work. At approximately six o’clock P.M., after Mrs. Stroup had completed her work for the day, she returned to the defendant’s lot where, it is alleged, she presented her parking ticket and parking fee to the defendant himself who then proceeded to personally search the lot for the automobile, and, being un *51 able to locate same, then called the police and reported the loss as a theft from his lot.
The trial judge rendered judgment in favor of the defendant and the plaintiff has appealed.
The plaintiff testified that the car was used by his wife every day that she worked, and that there were two other ladies who regularly rode with her to their work. He stated that on the day the automobile disappeared, which was January 2, 1958, his wife called him at his place of work to inform him that the car had been stolen. This, he says, occurred at approximately six o’clock P.M. He went immediately to the defendant’s lot but did not talk to Farrar as he arrived about the same time the police did.
Mrs. Stroup testified that she parked her car at the defendant’s lot every working day and that on the morning of January 2, 1958, she left her home about 9:30 A.M., proceeded downtown to the lot where she arrived at a little after 10:00 o’clock A.M. and that Mrs. Farrar received the car and gave her a ticket. The car was parked, according to her testimony, by a colored attendant named Willy Jones. She did not see Mr. Farrar at the time. This witness stated that because it was raining her employer released her about six o’clock P.M.; that she and Mrs. Magee, one of her customary passengers, proceeded to the lot where they met the other passenger, Mrs. Traylor. Upon arriving at the lot she said that she handed her ticket to Mrs. Farrar together with 450, the rate for all day parking, and that meanwhile Mr. Farrar had already seen her and had gone to get her automobile as he customarily did. This witness stated that Mr. Farrar went upon the lot, looked for the car and returned to tell her that he could not find it. She said that it was “pouring down rain” at the time and that Mrs. Farrar kept telling her husband that the car had to be on the lot as she was the one that had accepted it that morning and knew that it was there. After the police had been called and it was apparent that the car was missing, Mrs. Farrar offered to drive Mrs. Stroup, Mrs. Magee and Mrs. Traylor home and en route Mrs. Farrar repeated to them that she knew the car was there and did not understand how it had been moved without them seeing it.
On cross examination Mrs. Stroup stated that she received a ticket every day that she parked the car and repeated that on this particular day she handed both the ticket and the money to Mrs. Farrar at which time Mr. Farrar had already gone to get the automobile. She stated that on this particular day Mrs. Magee and Mrs. Traylor had not ridden to work with her due to the fact that they went to work early and she went to work late. When asked if she had gone anywhere else when she left home that morning she stated that she had not but had proceeded directly to the defendant’s parking lot. When asked the direct question of whether she had stated that she had first parked at J. C. Penney’s before proceeding to the defendant’s lot, she replied, “Well, if I did, what of it?”
Mrs. Lexie Magee testified that she worked with Mrs. Stroup at the Holly Store and regularly rode with her to work. She stated that on January 2, 1958 Mrs. Stroup reported for work about 11 o’clock A.M. and that when the store closed about six o’clock P.M. the two of them proceeded to the parking lot where they were joined by Mrs. Traylor. She stated that they had been riding to work together for about eight months and always parked at the defendant’s lot. She corroborated Mrs. Stroup’s testimony that it was raining when they went to get the automobile and said that Mr. Farrar went to look for it immediately and then returned in a few moments to report that he could not find it. When this occurred Mrs. Farrar, according to this, witness, stated: “I entered the car myself. I know it is on this lot.” She stated that Mrs. Stroup received a ticket each day that she parked her car and that the parking fee at that time was 450. On *52 cross examination she testified that on that particular morning she had gone to work by bus and that while she did not see Mrs. Stroup hand Mrs. Farrar the ticket and the money, she did see her walk up to the window and open her purse.
Mrs. Arra Traylor testified that she was employed at Mangle’s Dress Shop in Baton Rouge and for about eight months previous to January 2, 1958, had been regularly riding to and from work with Mrs. Stroup. On that particular day she rode the bus to work and sometime after dark proceeded to the parking lot arriving just after Mrs. Stroup and Mrs. Magee. She stated that it was raining and very cold and that as she got there Mr. Farrar was going to look for the car while Mrs. Stroup went to the booth and got her change out to pay Mrs. Farrar. Mr. Farrar then returned and said that he could not find the automobile. When this occurred Mrs. Farrar stated that she had taken the car in that morning and that it had been parked by the colored man named Willy. She said, further, that Mrs. Farrar repeated to them on the way home that she knew she had taken the car in that morning. The matter took place, according to this witness, after dark and between 8:30 and 9:00 o’clock P.M. When asked what remark, if any, was made by Mr. Farrar, she replied that he said that the car had not been parked there that morning.
On cross examination Mrs. Traylor stated that, while Mrs. Stroup regularly received a ticket when she parked her car, she did not, on this particular day, see the ticket. She repeated that it was cold and, further, raining hard at the time. She later modified this statement by saying “As well as I can remember, I believe it was raining some, but it was awfully cold and mighty rough weather.” When asked further about the time, she said that she did not have her watch but knew that it was later than five o’clock but just couldn’t say what time the incident occurred.
Officer Billy Ashmore of the Baton Rouge Police Force testified that he was called with reference to the matter about 5:30 or 6:00 o’clock on the evening of January 2, 1958. He stated that Farrar told him that a car had been taken, and that it had been taken from the back of his parking lot. When asked about the weather condition at that particular time, his reply was as follows: “I believe the weather was kind of damp. They had a drizzling rain and possibly kind of cloudy, if I remember correctly.”
On cross examination this witness stated that what he believed Farrar told him was the lady, Mrs. Stroup, had told him that her car was missing.
The defendant, Herman Farrar, testified that he had operated his parking lot business for some nine years. He said that he opened his business at 6:45 A.M. and closed shortly after 6:00 P.M. each night except Mondays and Thursdays on which nights he closed shortly after 9:00 P.M. Pie also stated that he remained at his place of business continuously from the time it opened until the time he closed except on occasions when he would go to the bank or possibly to the corner to buy a newspaper. He operated his business with the assistance of his wife and two colored attendants. Mrs. Stroup, he said, was a regular customer of his and had been for about a year. Tickets were issued as cars were parked except those who paid monthly parking rates. His version of what happened was that when Mrs. Stroup walked up he told her “I don’t believe your car is here today”, and that after she had insisted it was, he went and looked for it. He stated on repeated occasions that he told Mrs. Stroup this as soon as she walked up and that he only went to look for the car to oblige her as he was certain that it was not on the lot. He was familiar with the car and parked it, together with other cars which were to be left there all day, in a certain area on his lot, which area he visited on many occasions on January 2, 1958. Pie repeated again and again that on the day in question the Stroup car was not on his parking lot. Defendant further testified that he kept a record of the parking tickets *53 issued by him; that he had a record of the ticket numbers issued to customers on January 2, 1958 and that the ticket numbers issued on that day checked with the number of cars which had been parked. He admitted that his wife was not positive as to whether or not the Stroup vehicle had been parked there that day, and, with further reference to the matter of a ticket, stated that Mrs. Stroup was never given a ticket as she was a regular customer and had told him that she did not want one as she did not want to be bothered with it. He relates a conversation had with Mrs. Stroup wherein she said that she knew she had brought the car to the lot because she had gone to the beauty parlor that morning and then to J. C. Penney’s where she had parked her car on Third Street from which spot she had left to come on the lot. He fixed the time of the occurrence as being about 8:45 P.M. and that there was no rain whatsoever.
Mrs. Mildred Farrar, the defendant’s wife, stated that as Mrs. Stroup was a regular customer, she did not give her a ticket when she parked, and, further, that the parking charge per day at that time was 35‡. She said further that she did not see the Stroup car on the day of January 2, 1958, and that when Mrs. Stroup was talking to her that evening she said she had been in the vicinity of J. C. Penney’s that morning. She denied ever having told anyone that the car was parked on the Farrar lot that day. She also said that she had not waited on Mrs. Stroup either on the morning of January 2, 1958 or on that night but her husband waited on her and told her as she arrived that she had not parked her car on his lot. She testified further that Mrs. Stroup appeared after 6:00 o’clock and she neither presented to her a ticket nor any money. She stated that as far as she could remember, it did not rain at all on the day in question and she was sure she would have remembered if it had rained as she was the one who drove Mrs. Stroup and her companions to their homes.
Curtis Robinson, employee of Mr. Far-rar, testified that he remembered the Stroup automobile but did not remember seeing it on the lot on January 2, 1958. He further stated that Mrs. Stroup was considered a regular customer and her car was always parked on a certain portion of the lot, which portion he had visited several times that day without having seen her car.
Alvie E. McGrew, employee of the Federal Government in charge of the Weather Bureau at Ryan Airport in Baton Rouge testified that on January 2, 1958 the observation made at Ryan Airport was the “Sky was variable, clear to occasionally partly cloudy and the visibility averaged ten to fifteen miles”. He stated that there was no rain at Ryan Airport and no rain was reported in any other section of the City. When asked his opinion as to the possibility of rain in Baton Rouge between 5 :00 o’clock and 9:00 o’clock of that particular night, he said he thought it would be “highly improbable”.
With the above hopelessly conflicting testimony, the Trial Judge was evidently of the opinion that the plaintiff had failed to establish his claim by a preponderance of the evidence. In order to arrive at this conclusion he had to necessarily evaluate the credibility of the witnesses and, as it has often been said, he is unquestionably in a far better position, having seen and observed them to pass upon whether or not they are telling the truth, than we are.
We have examined this record very carefully and cannot help but wonder, if Mrs. Stroup had been given a ticket as she so stated, why, upon learning that her car had disappeared, neither she nor her husband asked for same if it had been handed to one of the parking lot employees or produced it in court if it had not.
Certainly, there is no manifest error in the conclusions of the Trial Judge and the Judgment appealed from must therefore be affirmed.
Judgment affirmed.